*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 20-CV-536 & 20-CV-696

BDO USA, LLP, *et al*., APPELLANTS,

V.

ERIC JIA-SOBOTA &
A2Z ASSOCIATES, INC. D/B/A EVERGLADE CONSULTING, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2020 CAB 2600)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued Jan. 27, 2022                         Decided October 6, 2022)

*Michael B. Kimberly*, with whom *James M. Commons* and *Julie H. McConnell* were on the brief, for appellant.

*Brian Walsh*, with whom *Ari Micha Wilkenfeld*, *Todd A. Bromberg*, *Krystal B. Swendsboe*, and *Hyok Chang* were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, DEAHL, *Associate Judge*, and STEADMAN, *Senior Judge*.

Opinion of the court by *Associate Judge* DEAHL.

Concurring opinion by *Associate Judge* DEAHL at page 25.

DEAHL, *Associate Judge*:  Eric Jia-Sobota was a partner at BDO USA, LLP, an accounting firm.  He resigned from the partnership to launch a competing firm, and BDO invoked its right to arbitrate various disputes attendant to his departure, mostly involving Jia-Sobota's attempts to bring BDO clients and personnel to his new firm.  Around the same time, BDO—pointing to a provision in its arbitration agreement with Jia-Sobota that allowed either party to "seek provisional remedies" in court—filed a complaint in Superior Court seeking to enjoin Jia-Sobota from doing business with or soliciting BDO's clients, or otherwise using its proprietary information, while the arbitration proceedings were pending.

When BDO then moved to compel arbitration, the trial court denied the motion, ruling that BDO had implicitly waived its right to enforce the arbitration clause through its litigation tactics.  BDO now challenges that ruling in this appeal.  Because it is uncontested that the arbitration agreement between BDO and Jia-Sobota allowed either party to pursue an injunction without waiving its arbitration rights, and because Jia-Sobota has not shown that BDO took any action inconsistent with its intent to arbitrate its underlying claims, we agree with BDO that it did not waive its right to arbitrate, contrary to the trial court's ruling.  *See generally TRG Customer Sols., Inc. v. Smith*, 226 A.3d 751 (D.C. 2020).

Jia-Sobota argues that we should nonetheless affirm on the alternative ground that the arbitration clause is unenforceable because it contemplates an arbitration panel composed entirely of BDO's own partners. In Jia-Sobota's view, permitting BDO's partners to effectively sit in judgment of their own case would be both unconscionable and against public policy, given their patent self-interest. The trial court did not reach the question of enforceability, however, and we decline to resolve it without the benefit of the trial court's input. We therefore vacate the trial court's order concluding that BDO waived its right to arbitrate and remand for consideration of Jia-Sobota's challenges to the enforceability of the arbitration agreement.

**I.**

Eric Jia-Sobota was a partner at BDO for eight years. When he entered the partnership in 2012, he signed a partnership agreement providing that, in the event he left the partnership, he would be precluded from soliciting BDO clients and luring away BDO employees for two years. The agreement also included an arbitration clause. That clause states that "[a]ny controversy or dispute relating to this Agreement or the Partnership and its affairs or otherwise arising between a Partner and the Partnership . . . shall be considered and decided by an arbitration panel consisting of two (2) members of [BDO's] Board of Directors," and three BDO

partners who did not sit on the board. An earlier provision in the agreement that is relevant in this dispute states that "[t]he term 'Partner' herein includes 'former Partner.'" Notwithstanding the arbitration clause, the agreement also expressly permitted either party to "seek provisional remedies from a court."

Jia-Sobota submitted notice of his intent to withdraw from the partnership in April of 2020, at which point he was serving as head of BDO's Industry Specialty Services Group. BDO responded by cutting Jia-Sobota off from access to his company email, partnership resources, and his colleagues. Jia-Sobota started a new firm called EverGlade Consulting the following month. According to BDO, Everglade's launch was the culmination of a "months-long scheme" through which Jia-Sobota planned to lure BDO clients and employees to his new firm, effectively stealing the Industry Specialty Services Group practice from BDO. Jia-Sobota's maneuvering violated his fiduciary duty to the partnership, as well as the anti-poaching and non-compete provisions in the partnership agreement, in BDO's view.

In the months that followed, BDO pursued these claims via a two-track litigation strategy. First, on May 26, BDO filed a "Complaint for Injunctive Relief in Aid of Arbitration" in Superior Court, naming both Jia-Sobota and EverGlade as defendants. In the first paragraph of its complaint, BDO stated that it was seeking

"a temporary restraining order and a preliminary injunction in aid of arbitration, as expressly authorized by the partnership agreement."[1] BDO asked the court to enjoin Jia-Sobota and Everglade "from utilizing any and all BDO trade secrets and confidential or proprietary information, doing business with or soliciting business from BDO clients or prospective clients, or offering employment to any current employee of BDO during the pendency of arbitral proceedings."

While seeking this injunction from the trial court, BDO simultaneously took steps to initiate arbitration of its underlying claims against Jia-Sobota. On June 5, ten days after filing its complaint in Superior Court, BDO filed its "demand for arbitration," summarizing its claims against Jia-Sobota and triggering the arbitration process. Soon thereafter, BDO wrote to Jia-Sobota requesting his input in selecting the members of the arbitration panel, though Jia-Sobota demurred.

Meanwhile, in court, BDO sought and was granted expedited discovery in support of its requests for injunctive relief. BDO was aggressive with its discovery

---

[1] A temporary restraining order is often a precursor to a preliminary injunction. It is a more immediate and typically briefer form of injunctive relief, often used to preserve the status quo while the parties litigate the propriety of a more extended injunction. *See generally* D.C. Sup. Ct. Civ. R. 65(a)-(b) (describing the two, with temporary restraining orders expiring after fourteen days unless extended).

requests, demanding a wide assortment of information and documents from Jia-Sobota, EverGlade, and a number of third parties, spanning the entire eight years of Jia-Sobota's partnership. BDO also sought to take at least eight depositions of parties and non-parties alike. On June 11, Jia-Sobota filed an answer to BDO's complaint, which included several affirmative defenses to BDO's claims as well as six counterclaims against BDO, its CEO, and its affiliates. Two of those counterclaims are relevant here. First, Jia-Sobota claimed that, during his employment, BDO had made material misrepresentations in violation of the False Claims Act. *See* 31 U.S.C. §§ 3729 to 3731. Second, Jia-Sobota sought a declaratory judgment that the arbitration clause in his partnership agreement with BDO was unconscionable and therefore unenforceable against him. Jia-Sobota followed his answer with discovery requests of his own.

On June 17—six days after Jia-Sobota filed his answer and counterclaims but before BDO responded—the trial court denied BDO's motion for a temporary restraining order. The court's denial of BDO's TRO request expressed some skepticism about the merits of BDO's case. Twelve days later, on June 29, BDO moved (1) to compel arbitration on four of Jia-Sobota's counterclaims and (2) to dismiss with prejudice Jia-Sobota's purportedly non-arbitrable counterclaims under

the False Claims Act and for declaratory judgment.[2]  Two days after that, Jia-Sobota moved to stay all arbitration.  He made two arguments in support of his motion: (1) that BDO had waived its arbitration rights by litigating in a manner inconsistent with an intention to arbitrate, and (2) that, in any event, the arbitration clause was unenforceable by BDO because it was both unconscionable and against public policy.  The parties then agreed to postpone a then-imminent preliminary injunction hearing until September.

On September 2, before the preliminary injunction hearing, the trial court denied BDO's motion to compel arbitration of Jia-Sobota's counterclaims.  The court found that BDO had waived its right to compel arbitration by "engag[ing] in conduct inconsistent with the arbitration right."  More specifically, the court faulted BDO for (1) seeking a ruling on the merits regarding two of Jia-Sobota's counterclaims, (2) waiting until after the court had denied the TRO to move to compel arbitration, and (3) "engag[ing] in substantial amounts of discovery."  The court did not reach Jia-Sobota's argument that the arbitration clause was

---

[2] In its motion to dismiss, BDO argued Jia-Sobota's counterclaim under the False Claims Act was non-arbitrable as a matter of law because an action under that statute must be brought in the name of the United States, which has a right to intervene and may not be bound by private parties' arbitration agreements.  *See* 31 U.S.C. §§ 3730(b)(1)-(2).

unconscionable, having found that BDO had waived its right to arbitrate regardless. In a move that appears to have caused some confusion among the parties, the court also denied Jia-Sobota's motion to stay arbitration, explaining that the parties remained free to pursue arbitration if they mutually wished to do so: "In sum, if the parties wish to arbitrate, they may. If, conversely, any party chooses not to engage in arbitration, the Court will not compel" that party to do so. BDO appealed.

The following month, with its first appeal pending, BDO took steps to proceed with the arbitration of its original claims against Jia-Sobota. BDO wrote to the arbitration administrator to request a panel be formed without input from Jia-Sobota because of his recalcitrance in the arbitration process. Jia-Sobota responded by asking the trial court to order BDO to show cause why it should not be held in contempt for violating the court's September 2 order. BDO opposed that motion, arguing that the trial court's September 2 order had dealt solely with BDO's authority to compel arbitration of Jia-Sobota's *counterclaims*, and in no way inhibited BDO's right to arbitrate its own claims.

The court disagreed. In a November 9 order, it characterized its prior September 2 order as barring arbitration of not only Jia-Sobota's counterclaims, but of BDO's original claims as well. Accordingly, the trial court found that "a request

from [BDO] . . . to proceed forward by selecting an arbitration panel based upon the very arbitration clause that this Court found [BDO] waived enforcement of is in direct contradiction with this Court's findings," and ordered BDO to show cause why it should not be held in contempt. BDO appealed that order as well, and we consolidated its two appeals.

## II.

We begin by dismissing BDO's appeal from the November 9 order to show cause why it should not be held in contempt (No. 20-CV-696). We lack jurisdiction to entertain that appeal because the order to show cause is not a final order, *see* D.C. Code § 11-721(a)(1); *RFB Props. II, LLC v. Deutsche Bank Tr. Co. Ams.*, 247 A.3d 689, 694 (D.C. 2021) (citing *Rolinski v. Lewis*, 828 A.2d 739, 746 (D.C. 2003) (en banc)), nor is it appealable under any exception to the general rule that only final orders are appealable. *See* D.C. Code §§ 11-721(a)(2) and (3). This dismissal is ultimately of little consequence, however, because BDO's principal challenge to the November 9 order is that the trial court erred in concluding that BDO waived its arbitration rights, which is the same attack it directs at the September 2 order.

## III.

We now turn to the question of whether BDO waived its right to arbitrate. "District of Columbia and federal law broadly protect the right of a party to contract for the use of arbitration" in lieu of judicial proceedings. *TRG*, 226 A.3d at 755.[3] An arbitration agreement is "a creature of contract," and the parties should generally "be held to the terms to which they have agreed." *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992). "However, like any contract right, the right to arbitrate may be waived—either expressly or by implication." *TRG*, 226 A.3d at 755 (citing *Hercules & Co. v. Beltway Carpet Serv. Inc.*, 592 A.2d 1069, 1073 (D.C. 1991)). In evaluating whether a party has implicitly waived its right to enforce an arbitration clause, "the essential question is whether, under the totality of the

---

[3] The trial court applied the District's law when assessing whether BDO waived its right to arbitrate. BDO did not object at the time. Now, for the first time on appeal, BDO argues that New York law should apply to the question of waiver, citing a provision in the partnership agreement providing that New York law applies to "the validity, construction, administration and effect of the" arbitration clause. We reject that argument for two reasons. First, it is not clear that the question of waiver concerns "the validity, construction, administration [or] effect" of the arbitration clause. Second, and more importantly, BDO has waived the argument that New York law applies to the question of waiver (as opposed to enforceability) because BDO never made that argument in trial court. *See Williams v. Gerstenfeld*, 514 A.2d 1172, 1177 (D.C. 1986) ("As a general rule, matters not properly presented to a trial court will not be resolved on appeal."). We therefore apply the District's law, as the trial court did.

circumstances, [that] party has acted inconsistently with the arbitration right" as defined by the terms of agreement. *Id.* (citation omitted); *see also SJ Enters., LLC v. Quander*, 207 A.3d 1179, 1184 (D.C. 2019) ("[W]aiver [of a contractual right] . . . may be inferred from conduct inconsistent with an intent to enforce that right." (citation omitted)).[4] Whether a party has implicitly waived its right to arbitrate is a question of law that we consider de novo. *Hercules*, 592 A.2d at 1073.

The question of waiver is a fact-intensive inquiry. *See Hossain v. JMU Props., LLC*, 147 A.3d 816, 822 (D.C. 2016). Because the parties' rights and obligations are defined by contract, it is not enough for us to examine their actions in a vacuum; we must consider the potential conflict between the parties' actions and the arbitration right as defined by the agreement at issue. An action that constitutes waiver in one case might be perfectly compatible with arbitration in another. Bearing that in mind, our caselaw suggests the following, non-exhaustive list of

---

[4] In *TRG*, we also said that arbitration holds a "favored status," so that we "must resolve any ambiguity regarding the scope of a waiver in favor of arbitration." 226 A.3d at 756 (citations omitted). We do not rely on that principle here, but note that its continuing vitality is subject to doubt after the Supreme Court decided *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022). *Morgan* held, with regard to federal law, that "a court may not devise novel rules to favor arbitration over litigation." *Id.* at 1713. "The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* Because we conclude that BDO did not waive its right to arbitrate, we have no cause to consider what (if any) effect *Morgan* has on the ongoing validity of the presumption we articulated in *TRG*.

"parameters" or "themes," *TRG*, 226 A.3d at 757, that counsel in favor of finding waiver:

- An "unexplained delay . . . [that] cannot be squared with an intent to arbitrate" according to the terms of the agreement. *Id.* at 758 (defendant did not communicate desire to arbitrate until five months after initiation of judicial proceedings); *see also Cornell & Co. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966) (four months);

- Motions practice that "invokes the authority of the trial judge to alter the course of the case," *TRG*, 226 A.3d at 759, or uses arbitration as a "strategy to manipulate the legal process" and get a "'second bite' at a favorable outcome," *id.* at 758 (quoting *Nat'l Found. for Cancer Rsch. v. A.G. Edwards & Sons, Inc.*, 821 F.2d 772, 776 (D.C. Cir. 1987)) (defendant filed two dismissal motions, entered into a "scheduling order contemplating a lengthy discovery period," and moved to dismiss for *forum non conveniens* before moving to compel arbitration, *id.* at 759); *see also, e.g.*, *Khan v. Parsons Glob. Servs., Ltd.*, 521 F.3d 421, 427 (D.C. Cir. 2008) (defendant moved for summary judgment of an arbitrable claim);

- The "conscious decision to exploit the benefits of pretrial discovery . . . with relation to [] arbitrable claims," where such discovery is "fully available . . . only in the judicial forum." *TRG*, 226 A.3d at 758 (quoting *Nat'l Found.*, 821 F.2d at 776); *see also Nat'l Found.*, 821 F.2d at 773 (parties engaged in two years' worth of discovery before invoking the arbitration right);

- And, perhaps, prejudice to the party opposing arbitration. *Hossain*, 147 A.3d at 823 (clarifying that, "prejudice, [] although not necessary, is a factor that can be taken into account"); *but see Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1712-13 (2022).[5]

---

[5] In *Morgan*, the Supreme Court recently suggested that, at least with regard to federal law, *any inquiry* into prejudice may be improper. 142 S. Ct. at 1713 ("Outside the arbitration context, a federal court assessing waiver . . . focuses on the actions of the person who held the right; the court seldom considers the effects of

Taking the above considerations as they apply to the partnership agreement between BDO and Jia-Sobota, we conclude that BDO did not implicitly waive its arbitration right. BDO was fully within its contractual rights to pursue a "two-track" litigation strategy, simultaneously seeking injunctive relief and pursuing arbitration of its underlying claims against Jia-Sobota. As it did so, BDO clearly and consistently stated its intention to arbitrate, and never acted inconsistently with that express intention.

## A. Unexplained Delay

The trial court relied heavily on the fact that BDO did not move to compel arbitration until after the court denied BDO's request for a TRO and expressed some skepticism as to the merits of BDO's claims. In the court's view, that demonstrated the kind of "gamesmanship and manipulation" of the litigation process that should be discouraged. *TRG*, 226 A.3d at 760. We disagree. Recall that BDO demanded arbitration of its own claims on June 5, just ten days after filing its complaint in Superior Court and well before the court had ruled on (and before Jia-Sobota even

_____

those actions on the opposing party. That analysis applies to the waiver of a contractual right, as of any other."). We nonetheless consider prejudice below, and need not grapple with the extent to which *Morgan* calls into doubt our precedents placing stock in it, because there is no meaningful prejudice here in any event.

responded to) BDO's TRO request. While it is true that BDO did not move to compel arbitration of Jia-Sobota's *counterclaims* until after the court had denied its TRO request, BDO had only the most fleeting opportunity to do so. Jia-Sobota filed his answer and counterclaims on June 11. The court denied BDO's TRO request only six days later, on June 17. And it was only twelve days after that, on June 29, when BDO moved to compel arbitration of (most of) those counterclaims in a substantive filing that undoubtedly and understandably took considerable care and time to draft. That timeline does not suggest strategic delay on BDO's part; it evinces reasonable promptness.[6]

BDO also made clear from the outset that its requests for injunctive relief were "in aid of arbitration," language that appeared in both the caption and first paragraph of BDO's complaint. And BDO's motion for a TRO reiterated that "[a]ll of these

---

[6] BDO emphasizes that the timeline in this case—days and weeks—is far shorter than the timeline in other cases where courts have found waiver. That is true, but that distinction is not dispositive on its own. This case is somewhat atypical in that the party seeking arbitration, BDO, also initiated the litigation, while most of our cases involve defendants who move to compel arbitration after being brought into court. *See, e.g.*, *TRG*, 226 A.3d at 753; *Hercules*, 592 A.2d at 1070; *cf. Hossain*, 147 A.3d at 817-18 (plaintiff sought to compel arbitration of a counterclaim). It is to be expected that a defendant would take more time to decide whether to invoke its right to arbitrate in response to a claim than would the party driving the litigation, who might have foregone the court proceedings altogether.

claims are subject to a binding arbitration agreement," and the partnership agreement was appended to the motion as the sole exhibit. Thus, the court was on notice well before ruling on the TRO that BDO intended to arbitrate its underlying claims. If the court believed ruling on the TRO request would tip its hand in some way that was inconsistent with BDO retaining that right, it might have given some forewarning to that effect, or simply not ruled until it was satisfied that BDO had picked its preferred lane.[7] Its decision to rule on the TRO request instead, despite all indications that BDO was seeking to arbitrate, cannot be counted against BDO in the implied waiver calculus. There was no unexplained delay on BDO's part because there was nothing that could fairly be described as delay at all.

### B. BDO's Motion to Dismiss Two Claims

The trial court also found that BDO, in moving to dismiss two of Jia-Sobota's counterclaims, was "seeking a ruling on the merits," which it deemed "inconsistent with the arbitration right." BDO responds that it moved to dismiss only Jia-Sobota's

---

[7] There is no evidence that BDO unreasonably delayed the arbitration process itself. BDO contacted Jia-Sobota to begin constituting an arbitral panel within weeks of filing its arbitration demand. Indeed, to the extent the arbitration process was delayed, that delay was attributable to Jia-Sobota, who declined to engage in initial steps of arbitration as he pressed his argument that arbitration should be stayed.

*non-arbitrable* claims, and that such a motion cannot support a finding that it waived arbitration of its remaining, arbitrable claims. We agree. We have been clear that a motion for judgment on the merits of non-arbitrable claims does not constitute waiver as to other, arbitrable claims. *See Hercules*, 592 A.2d at 1075 ("The trial judge's conclusion that Hercules' filing of a motion for summary judgment on a *non-arbitrable* count of the complaint constituted a waiver of its right to demand arbitration was [] erroneous.").

Jia-Sobota does not dispute BDO's contention that the two claims on which BDO sought dismissal were non-arbitrable.[8] Instead, he offers two other arguments why BDO's motion to dismiss affected a waiver, neither of which is persuasive. First, Jia-Sobota argues that BDO, in its motion to compel arbitration, implicitly sought a merits ruling on the enforceability of the arbitration clause against "three parties that were not signatories" to the agreement (EverGlade, BDO Public Sector, and BDO's CEO). According to Jia-Sobota, making such a ruling would require the court to make factual findings about "the relationship between" those parties, which BDO could then treat as the law of the case in arbitration. But that issue is precisely

---

[8] Jia-Sobota later amended his False Claims Act counterclaim in a manner that arguably rendered it arbitrable, but he does not contend that it was arbitrable as originally pled, which was what BDO sought to dismiss.

the kind of "preliminary 'gateway dispute[] about whether the parties are bound by [an] arbitration clause'" that we have expressly found appropriate for a court to decide attendant to arbitration. *See Hossain*, 147 A.3d at 821 (quoting *Woodland Ltd. P'ship v. Wulff*, 868 A.2d 860, 864 (D.C. 2005)).

Second, Jia-Sobota points to what he claims is a disconnect between the scope of BDO's complaint and its demand for arbitration. He argues that because BDO's complaint included claims that it did not raise in arbitration, BDO was asking the court to make merits rulings on those claims, at odds with its stated intent to arbitrate. We disagree. BDO never asked the trial court to make merits judgements on *any* of its claims. Its complaint made clear that BDO was seeking only injunctive relief.[9] In short, we conclude that BDO's motion to dismiss Jia-Sobota's non-arbitrable claims did not "manipulate the legal process," and its subsequent motion to compel arbitration was not an attempt to procure an ill-gotten "'second bite' at a favorable outcome." *TRG*, 226 A.3d at 758 (quoting *Nat'l Found.*, 821 F.2d at 776).

---

[9] Jia-Sobota also argues in passing that we should consider BDO's conduct in other litigation arising from the same events as evidence that BDO "does not care about arbitration." There is little in the record to inform us about the details of the other cases he cites, all of which were filed in the summer of 2020 in New York state courts. Suffice to say that Jia-Sobota's agreement with BDO provided only that the parties had the *option* to arbitrate. There is nothing in the agreement that requires BDO to be consistent about how it exercises that option with regard to other disputes, under different law, in other courts.

## C. Exploiting Pretrial Discovery

Jia-Sobota's strongest point comes in this third consideration. The substantial amounts of discovery that BDO engaged in to support its claim for injunctive relief conflicts with its stated desire to pursue arbitration, where discovery rights are considerably more curtailed. Still, it is important to recall that the partnership agreement expressly permitted either party to seek injunctive relief without waiving its right to arbitration, and that BDO consistently represented to the court that it was doing just that.

Jia-Sobota does not dispute that BDO's contractual right to seek prospective relief included the right to engage in some discovery. Instead, Jia-Sobota contends that the breadth of that discovery affected a waiver. He argues that BDO's discovery requests were (a) overly aggressive, seeking evidence outside the scope of its injunction request in order to build its case in advance of arbitration with evidence that would be inaccessible via arbitration alone, and (b) one-sided, because BDO aggressively sought to limit Jia-Sobota's discovery and because Jia-Sobota—under BDO's arbitration rules—is not guaranteed any meaningful right to discovery in the arbitration itself. BDO, in contrast, maintains that its discovery requests were "carefully tailored to the issues presented" in its requests for injunctive relief, and

that the scope of those requests was justified because its case is "factually complex" and requires "substantial investigation" to prove.

We agree with the premise of Jia-Sobota's argument—that BDO's right to in-court discovery was limited to what was relevant to support its injunction request. To the extent its discovery requests exceeded that scope, and discovery was not targeted at questions underlying the injunction request but instead leveraged the court's resources and authority to harass Jia-Sobota or to gather evidence that was not relevant to its in-court claims in order to build its case in arbitration, that would surely represent the kind of "gamesmanship and manipulation" our precedents seek to prevent. *TRG*, 226 A.3d at 760. However, in this case, it is difficult to identify any impermissible discovery request because in order to secure an injunction BDO was obliged to demonstrate a "substantial likelihood" that it would "prevail on the merits" of its underlying claims. *Feaster v. Vance*, 832 A.2d 1277, 1287 (D.C. 2003) (citation omitted). That means that most—if not all—the evidence relevant to BDO's underlying claims is also relevant to the injunction request and therefore within the realm of permissible discovery in support of its in-court claim. *See* Super. Ct. Civ. R. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.").

The D.C. Circuit faced an analogous situation in *National Foundation for Cancer Research v. A.G. Edwards & Sons, Inc.*, 821 F.2d at 775. In that case, a party was faced with both arbitrable and non-arbitrable claims arising from the same transaction. *Id.* It engaged in discovery that was potentially relevant to both sets of claims, and then sought to arbitrate only the arbitrable claims. *Id.* Although the court emphasized that the mere existence of the non-arbitrable claims did not foreclose a finding of waiver, it found that the overlap between the arbitrable and non-arbitrable claims "counsel[ed] caution from inferring waiver from [the party's] discovery efforts." *Id.* So too here. If anything, that caution is even more warranted here, where the scope of the in-court litigation was explicitly limited to injunctive relief, and the court was on notice of that. All of BDO's motions for discovery were made, and granted, on the grounds that the requested discovery was relevant to BDO's motion for an injunction. If the trial court felt that BDO's discovery requests exceeded the scope of the litigation, it should have denied those requests, or at least sought clarification from BDO as to what remedies it was pursuing in the judicial forum. Instead, the court granted BDO's discovery requests, only to turn around later and rule that those same requests were—notwithstanding the terms of the partnership agreement—so extensive that BDO had waived its right to arbitrate.

Exercising the same caution that the D.C. Circuit advised, we disagree with the trial court's assessment that BDO's aggressive use of discovery weighs heavily in favor of a waiver finding. Although we do not foreclose the possibility that late-breaking evidence of genuine gamesmanship or duplicity by a party in BDO's position could support a finding of waiver, neither Jia-Sobota nor the trial court point to any such evidence here.[10] In its absence, we decline to rule that BDO's discovery requests were out of bounds simply because they were also relevant to the claims it wanted to arbitrate.

## D. Prejudice

Although the trial court did not comment on the question of prejudice, Jia-Sobota asks us to consider (1) the time and resources he has been forced to expend

---

[10] Jia-Sobota encourages us to find such evidence in the one-sidedness of BDO's discovery—in particular the fact that it aggressively resisted Jia-Sobota's efforts in court to engage in discovery of his own, and that its arbitration rules do not guarantee Jia-Sobota any meaningful discovery in arbitration. We decline to do so. For one thing, if the trial court felt that the asymmetry of the discovery process was unfair, there were less oppressive ways of levelling the scales. There is no reason why it could not grant Jia-Sobota equally expansive discovery rights if fairness so dictates. Moreover, as BDO concedes, any arbitration in this case is subject to judicial review. Thus, if, after arbitration, it appears BDO has manipulated the process to deprive Jia-Sobota of a fair opportunity to adjudicate his case, Jia-Sobota will have recourse in the courts. *See* D.C. Code § 16-4423 (establishing grounds to set aside an arbitral order).

litigating BDO's injunction claim, and (2) that BDO's litigation tactics have allowed it to gain access to information about Jia-Sobota and his firm that it would not have been able to procure in arbitration. Those considerations carry little weight under these circumstances. As explained above, in determining whether a party has implicitly waived its right to arbitration, "the essential question is whether, under the totality of the circumstances, [that] party has acted inconsistently with the arbitration right" as defined by the terms of the agreement. *TRG*, 226 A.3d at 755. Jia-Sobota has not shown that BDO has taken any such action. Whatever disadvantage may have accrued to Jia-Sobota as a result of BDO's litigation tactics, that disadvantage stemmed from BDO's compliance with the parties' agreement. A party does not waive a contractual right simply because exercising that right turns out to disadvantage the other party.

Because the terms of Jia-Sobota's partnership agreement allow BDO to pursue a preliminary injunction in court without waiving its right to arbitration, and because BDO has taken no action inconsistent with its intent to do exactly that, we conclude BDO has not waived its right to arbitrate and vacate the trial court's order to the contrary.

**IV.**

Jia-Sobota argues that even if BDO did not waive its right to arbitrate, the arbitration clause is unenforceable both because it is unconscionable and against the public policy of the District of Columbia. The trial court did not reach the question of enforceability, having concluded that BDO, in any event, had waived its right to arbitrate. We have now rejected that basis for the trial court's ruling, though Jia-Sobota is correct that we nonetheless have discretion to affirm the trial court's judgment on an alternative ground, so long as there would be "no procedural unfairness" in doing so. *See Jaiyeola v. District of Columbia*, 40 A.3d 356, 372 (D.C. 2012) (explaining there may be no procedural unfairness where "the opposing party had notice of the ground upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto" in the trial court (quoting *Franco v. District of Columbia*, 3 A.3d 300, 307 (D.C. 2010))). We decline to exercise our discretion to consider this alternative ground for affirmance, and instead leave it to the trial court to address it in the first instance.

Animating our decision not to resolve the question of enforceability is the fact that there is virtually no evidentiary record or factual findings on issues that might

inform the "strongly fact-dependent inquiry" into unconscionability.[11] *Keeton v. Wells Fargo Corp.*, 987 A.2d 1118, 1121 (D.C. 2010). "[A]ny evaluation of unconscionability is tied so closely to the facts of a particular case that we are not in a position to say, on the basis of the limited pleadings before us, whether this particular contract [provision] is unconscionable." *Bennett v. Fun & Fitness of Silver Hill, Inc.*, 434 A.2d 476, 480 (D.C. 1981). We therefore remand for the trial court to address the arbitration clause's enforceability in the first instance.

---

[11] BDO argues that, under the partnership agreement's choice-of-law clause, New York rather than the District law governs the question of enforceability. *See King Carpentry, Inc. v. 1345 K St. SE, LLC*, 262 A.3d 1105, 1110 n.3 (D.C. 2021) (choice-of-law provisions are "generally understood to incorporate [] substantive law"); *Parker v. K & L Gates, LLP*, 76 A.3d 859, 870 (D.C. 2013) (holding that a procedural rule does not "directly determine the enforceability of [an] arbitration clause"). Assuming that is correct, and it is unclear the extent to which that is a contested point, New York law is in accord that questions of unconscionability are often fact-intensive. *See, e.g., Lawrence v. Miller*, 901 N.E.2d 1268, 1272-73 (N.Y. 2008) ("[W]e have not been presented with facts . . . to evaluate the agreement's unconscionability."); *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2011) ("Where there is doubt as to whether a contract is fraught with elements of unconscionability, there must be a hearing where the parties have an opportunity to present evidence with regard to the circumstances of the signing of the contract, and the disputed terms' setting, purpose and effect." (quoting *Davidovits v. De Jesus Realty Corp.*, 474 N.Y.S.2d 808 (N.Y. App. Div. 1984))).

## V.

We reverse the trial court's ruling that BDO waived its right to enforce the arbitration clause in its partnership agreement with Jia-Sobota, and remand the case for further proceedings. We also dismiss the appeal from the trial court's November 9, 2020, order to show cause.

*So ordered.*

DEAHL, *Associate Judge*, concurring: I am in full agreement with my colleagues that the prudent course is to remand the question of whether the arbitration clause is unenforceable. I write separately to highlight several factors and precedents that I believe the trial court ought to take into its consideration of Jia-Sobota's unconscionability argument.

First, I want to highlight how extraordinarily oppressive this arbitration clause is when applied to a former partner like Jia-Sobota. This speaks to the clause's substantive unconscionability, which concerns when contractual terms are unreasonably favorable to one party. *Simon v. Smith*, 273 A.3d 321, 330 (D.C. 2022). BDO's complaint alleges that Jia-Sobota "engaged in a calculated and blatant scheme to steal . . . a $40 million business," and, through arbitration, BDO seeks to

have five of its current partners sit in judgment of its multi-million dollar claim against a person who is now its direct competitor. Those partners would clearly have direct economic interests in the arbitration's outcome, and would effectively be sitting in judgment over their own case against an adversary. Even under the New York law that BDO maintains applies to the question of unconscionability, the general right of parties to contract for the arbitrator of their choice is not without its limits:

> A well-recognized principle of 'natural justice' is that a man may not be a judge in his own cause. Irrespective of any proof of actual bias or prejudice, the law presumes that a party to a dispute cannot have that disinterestedness and impartiality necessary to act in a judicial or quasi-judicial capacity regarding that controversy.

*Cross & Brown Co. v. Nelson*, 167 N.Y.S.2d 573, 575 (N.Y. App. Div. 1957); *see also In re City of Rochester*, 101 N.E. 875, 876 (N.Y. 1913) ("[W]herever tribunals of justice have existed all men have agreed that a judge shall never have the power to decide where he is himself a party. . . . So vital is deemed the observance of this principle that it has been held that a judge disqualified [thereunder] cannot act even with the consent of the parties interested, because the law was not designed merely for the protection of the parties to the suit, but for the general interests of justice.").

An arbitration provision that names an arbitrator who is a "party to a contract, or someone so identified with the party as to be in fact, even though not in name, the party" is "illusory" and unenforceable under New York law. *Cross & Brown*, 167 N.Y.S.2d at 576; *see also id.* at 575 (further describing this as an "absolute disqualification"). New York courts have extended this rule to a situation in which an arbitration clause calls for a panel consisting entirely of members of a corporate party's board of directors. *See id.* at 575-76 ("We brush aside any metaphysical subtleties about corporate personality and view the agreement as one in which one of the parties is named as arbitrator. Unless we close our eyes to realities, the agreement here becomes, not a contract to arbitrate, but an engagement to capitulate.").

It is true that, "[a]s a general matter, under New York law, unconscionability requires a showing that a contract is *both* procedurally and substantively unconscionable when made." *Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 573 (N.Y. App. Div. 1998) (emphasis added and quotation marks omitted). That said, in some "exceptional" cases, a provision may be unconscionable based on substantive unconscionability alone. *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 829 (N.Y. 1988); *see also Urban Invs., Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983) ("[I]n an egregious situation," a showing of "one or the other may

suffice."). Where the terms of a provision—given their "context, their purpose, and their effect"—are sufficiently "outrageous," *id.*, "the substantive element alone may be sufficient to render the terms of [that] provision . . . unenforceable," *Brower*, 676 N.Y.S.2d at 574. This provision at least skates up to the line of unconscionable on substance alone, even absent any consideration of procedural unfairness in its creation.

Second, there are several early indications of procedural unfairness in how these parties came to agree to the arbitration clause, though I acknowledge the record is too thin to firmly opine on that question.[12] The procedural component of unconscionability focuses on the bargaining process itself, essentially asking whether the term was agreed to via unfair surprise so that the complaining party cannot be said to have meaningfully agreed to it. While Jia-Sobota is a sophisticated party, cutting against any finding of procedural unconscionability, the substantive and procedural components of unconscionability operate on a "sliding scale." *See Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2011). The

---

[12] BDO incorrectly asserts that Jia-Sobota "expressly disclaimed any effort" to show procedural unconscionability in the trial court. He did no such thing. He instead correctly noted that the substantive unconscionability of a clause might be enough to render it unenforceable in egregious circumstances, *supra*, and argued that this was one such case. While he did not make a targeted argument that procedural unconscionability exists here, neither did he disclaim its existence.

more substantively intolerable a provision is—and this one approaches an apex on that front—the less courts will abide the lack of a meaningful choice in how the parties arrived at it. "A contract that is 98 parts substantively unconscionable may require only two parts of procedural unconscionability to render it unenforceable and vice versa." 1 White, Summers & Hillman, Uniform Commercial Code § 5:16 (6th ed. 2021). In other words, "[t]he harsher the clause, the less 'bargaining naughtiness' that is required to show unconscionability." *Id.* (citation omitted).

The strongest sign of procedural unconscionability here is that BDO seems to have hidden the most oppressive aspect of this arbitration clause—its application to former partners—in a 46-page, single-spaced, apparently standard-form contract of the take-it-or-leave-it variety.[13] While it is plain as day that the arbitration clause

---

[13] This is not like the collective bargaining agreement that BDO highlights and the Second Circuit considered in *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, which the court noted was "negotiated and refined over time by the parties themselves so as to best reflect their priorities, expectations, and experience." 820 F.3d 527, 536 (2d Cir. 2016). That case concerned Tom Brady's challenge to his four-game suspension related to "Deflategate," which NFL Commissioner Roger Goodell arbitrated, ultimately upholding the suspension. *Id.* at 531. It bears little resemblance to the case before us. For one, that case did not even involve an unconscionability argument, which surely would have been dead on arrival considering (1) that the NFL Players Association could be said to have bargaining power roughly equal to the NFL Management Council, which cannot be said of Jia-Sobota vis-à-vis BDO, (2) the chosen arbitrator, Roger Goodell, had no apparent direct financial stake in the arbitration's outcome (and seemingly acted contrary to his indirect financial interests, sidelining one of the NFL's biggest stars

applies to disputes "between a Partner and the Partnership"—i.e., intra-partnership disputes, where having an all-partner panel makes some sense—its application to former partners can only be found two clauses earlier, amidst a page-long provision that indicates "[t]he term 'Partner' herein includes 'former Partner.'" For a clause like this to be enforceable against former partners, it ought to be in large, bold and underlined font, not lurking in diffuse component parts in a sprawling contract. On the other hand, the record is scant on other questions that would inform a procedural unconscionability inquiry: for all we know, Jia-Sobota had sat on one of BDO's arbitral panels himself, was specifically warned of this clause before agreeing to it, or knew full-well of its application to former partners through office lore. I cannot say on this record, but the early indications are there are at least two parts procedural unconscionability here sufficient to nudge the 98 parts substantive unconscionability over the line of unenforceability.

Third, a number of cases have considered the enforceability of BDO's arbitration clause, and while the results have been mixed, the cases ruling that it is unenforceable seem to have the better of the argument. Both Jia-Sobota and BDO

---

for a stretch), and (3) it was truly an intra-league dispute, with Tom Brady still an active player, so it does not resemble BDO's partners sitting in judgment of a dispute with a *former* partner and direct competitor.

point to unpublished opinions of New York trial courts. Jia-Sobota cites to *Romer v. BDO Seidman*, No. 1995-7807 (N.Y. Sup. Ct. Feb. 9, 1996) (unpublished),[14] where the court found unenforceable an arbitration clause that set an arbitral panel consisting entirely of BDO partners. The *Romer* court reasoned that, because BDO's partners had "a direct financial interest in the outcome," the clause designating them as the sole arbitrators could not be enforced because the panel would be "so identified with the party as to be in fact, even though not in name, the party." *Id.* (quoting *Cross & Brown*, 167 N.Y.S.2d at 576). Other courts applying New York law have reached the same conclusion in cases concerning iterations of this same arbitration clause. *See Buhrer v. BDO Seidman, LLP*, No. 022190C, 2003 WL 22049503, at *4 (Mass. Super. Ct. July 7, 2003) (concluding BDO's arbitration clause "is offensive to basic notions of fairness"); *BDO Seidman v. Miller*, 949 S.W.2d 858, 861 (Tex. App. 1997) ("the agreement to arbitrate is invalid on its face").[15]

---

[14] *Romer* was provided to the trial court as an exhibit, and it is part of the record before us, though it does not appear to be readily available through any online database.

[15] BDO's arbitration clause has changed slightly over time. *Buhrer* concerned a clause, like the one we confront here, where two members of the arbitral panel would be members of BDO's board of directors and three would be partners outside of the board. 2003 WL 22049503, at *3. *Romer* concerned a provision where two members of the arbitral panel would come from BDO's "Policy Group"—query if that is some predecessor or close cousin to the board of directors—and three would

BDO counters with *BDO Seidman, LLP v. Bloom*, 799 N.Y.S.2d 159 (N.Y. Sup. Ct. 2004) (unpublished), where the court determined that an arbitral panel consisting of two board members and three other partners was enforceable, even if the individual arbitrators had some financial stake in the proceedings. *Id.* at *8. The *Bloom* court focused not on "disinterestedness and impartiality," *Cross & Brown*, 167 N.Y.S.2d at 575,[16] but on agency—reasoning that the arbitrators were not acting as judges to their own dispute because "the five members that compose the [arbitral] panel acting as individuals, or in unison, do not have the ability to act for the

---

be partners outside of that group. And *Miller* involved three board members as arbitrators and two partners outside of the board. 949 S.W.2d at 861. None of those cases attached significance to those finer points of the arbitral panel's composition, as between board members and partners outside of the board, and any such distinction (as BDO tries to draw) strikes me as illusory.

[16] BDO argues that *Cross & Brown* was abrogated by *Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 623 N.E.2d 531, 534 (N.Y. 1993), and cites to two further cases in support of that argument, *see BDO Seidman, LLP v. Bee*, 970 So.2d 869, 875-77 (Fla. Dist. Ct. App. 2007); *Hottle v. BDO Seidman, LLP*, 846 A.2d 862, 875-76 (Conn. 2004). I disagree. *Westinghouse* concerned whether a mere employee of one contracting party could serve as an arbitrator, but the employee / employer relationship is not akin to the partner / partnership relationship. Only the latter relationship involves a direct financial interest in the outcome of the arbitration, so I find *Westinghouse* to be far afield from whether those with a direct financial stake in one party's finances can serve as the sole arbitrators to a dispute. Both *Buhrer* and *Miller* likewise persuasively rejected BDO's argument that *Westinghouse* effectively jettisoned *Cross & Brown*. 2003 WL 22049503, at *3 n.6; 949 S.W.2d at 861.

partnership in the manner the defendant complains of that gives rise to his counterclaims." *Bloom*, 799 N.Y.S.2d at *5.

I find *Bloom*'s reasoning wholly unpersuasive, and *Romer*'s a far more convincing application of New York law. The axiom articulated in *Cross & Brown*—"that a man may not be a judge in his own cause"—is grounded in the principle that the parties to a dispute are entitled to an adjudicator "who is not biased or prejudiced in favor of or against either side to the controversy." 167 N.Y.S.2d at 575 (quotation omitted). It defies common sense to presume that an individual with a direct and substantial financial stake in the outcome of a controversy is not operating as "a judge in his own cause" when they might directly line their pockets through their decision. Where the underlying question is bias, there is no reason that arbitrators with a direct and substantial financial stake in the outcome of an arbitration should be exempted from scrutiny simply because they lack authority to make decisions on behalf of the party they are aligned with.

In sum, I would frame the substantive unconscionability question for the trial court as whether the contemplated arbitral panel here is "so identified with [BDO] as to be in fact . . . the party." *Cross & Brown*, 167 N.Y.S.2d at 576. If so, then perhaps that is enough to find this arbitration clause unconscionable based on its

substance alone.  And, at the very least, it would be enough to find the arbitration clause unconscionable if, as it appears at first blush, the procedure by which Jia-Sobota came to agree to it gives no assurance that his was a genuine and informed assent to the clause.